**In re Robert McCANN, Debtor.**

**In re Robert K. KELLER, Dorcas B. Keller, d/b/a Kelcreek Farm, Debtors.**

**Bankruptcy Nos. 95–13016, 95–14966.**

United States Bankruptcy Court, N.D. New York.

Dec. 9, 1996.

Mark W. Swimelar, Standing Chapter 12 Trustee, Syracuse, NY.

Kim F. LeFebvre, Assistant United States Trustee, Albany, NY, As Amicus Curiae.

Robert H. Cohen, Schoharie, NY, for debtors.

Hiscock & Barclay (J. Eric Charlton, of counsel), Syracuse, NY, for Key Bank.

## MEMORANDUM–DECISION AND ORDER

ROBERT E. LITTLEFIELD, Jr., Bankruptcy Judge.

*Jurisdictional Statement*

This is a core proceeding under 28 U.S.C. § 157(b)(1), (b)(2)(A) and (b)(2)(L). This court has jurisdiction to hear and render a decision in this matter pursuant to 28 U.S.C. § 1334(a).

*Facts*

The captioned cases involve the same issue, therefore, the Court has consolidated them for the purposes of this decision. Debtors Robert and Dorcas Keller are in their early sixties and possess well in excess of a quarter century of farming experience. They continue to manage their farm with the assistance of their son Michael. In recent years the Kellers endeavored to modernize their equipment and enlarge their dairy herd thereby encumbering themselves with additional long term debt. The crucible of rising costs and diminished income led to a petition in this Court.

The Kellers' plan proposes to pay in full the fees of debtors' counsel, the Internal Revenue Service for 1995 payroll taxes, Mechanic's Lienor T. Sulem and Sons and Judgment Creditor Carolina Eastern–Vail. The obligation owed to Empire Farm Credit, secured by a mortgage on the debtor's farm, would be modified to amortize the note over thirty years with a balloon payment in ten years.

Similarly, the Central National Bank obligation, secured by a first lien on the herd, machinery, equipment, crops and proceeds would be modified by reamortizing the term to lower the ongoing payment due. Additionally, the debtors propose to satisfy a Central National auto loan by selling the vehicle and simultaneously remitting the proceeds to the bank, and to pay a Central National personal loan with a single payment.

Finally, the unsecured creditors would be paid in full over the life of the plan. Although not clear, the plan apparently contemplates a direct payment by the debtors to all creditors except the unsecured class.

Debtor Robert McCann is not in good health and, as a result, his son is managing the farm. Unfortunately, the debtor's son has no ownership interest and little managerial experience. As was indicated in an earlier oral decision in this case, herd numbers are inadequate as is the hay to feed them. Much of the farm machinery is in disrepair and milk production is below industry norms. However, the debtor does have equity in his real property such that the unsecured creditors will receive a minimum distribution of 85% over the life of the plan. The claims of Secured Creditors Farm Services Administration and Central National Bank will be reamortized over ten years and partially satisfied by sales proceeds over the life of the plan. All creditor payments will be made by the Chapter 12 Trustee.

### Discussion

■ Before the Court is a question of policy versus statutory interpretation. At issue in these cases is whether a Chapter 12 debtor may make direct payments to creditors whose claims are impaired or modified by the plan. This enables a Chapter 12 debtor to avoid making such payments through the Chapter 12 Trustee and, concomitantly, prevent the trustee from collecting a commission on those funds so paid.

Briefs were filed in this matter by Robert Cohen, Esq., attorney for Robert McCann, Mark Swimelar, Esq., the Standing Chapter 12 Trustee ("Trustee") and Kim F. Le-Febvre, Esq., the Assistant United States Trustee ("UST"). All sides argue that the plain meaning of the statute supports their respective positions; the Trustee and UST also posit that the Chapter 12 trustee system would be severely undermined should the Court find direct payments permissible.[1]

Chapter 12 was enacted in 1986 and was modeled after the existing chapter 13. Congress recognized the financial problems farmers were encountering in the 1980s as well as their difficulties in complying with the requirements of Chapters 11 and 13 and crossbred them resulting in the birth of Chapter 12. Thus, for example, while Chapter 12 debtors retain control over their property, as debtors-in-possession under 11 U.S.C. § 1203, there is no "absolute priority rule" as found in 11 U.S.C. § 1129(b)(2)(B), no provision for the appointment of an unsecured creditors committee as in 11 U.S.C. § 1102 and no requirement for the filing of a disclosure statement pursuant to 11 U.S.C. § 1125. Nor does a Chapter 12 secured creditor have the right of election found in section 1111(b). Additionally, the plan submission/confirmation process under Chapter 12 differs significantly from its sister provisions in Chapters 11 and 13. Obviously, Congress intended to differentiate among

---

1. One of the briefs submitted makes reference to 28 U.S.C. § 586(e)(1)(B)(ii)(I). (The Attorney General ... shall fix ... a percentage fee ... not to exceed ten percent of the payments made under the plan of such debtor ...). The statute thus sets a maximum fee based on the anticipated compensation and expenses of the trustee. The fee is reduced to a maximum of 3 percent— when payments "made under the plan of such debtor" exceed $450,000. As the issue in these cases is not the specific trustee percentage fee but whether the debtors may disburse directly to secured claims, the Court leaves to another case on another day the enigma of the curious phrase "payments to be made under the plan."

Chapters 11, 12 and 13 in recognition of the different needs of debtors who avail themselves of the various relief available. One area of similarity, however, is the provision for a standing trustee in Chapters 12 and 13. 11 U.S.C. §§ 1202(a), 1302(a). Compensation for the standing trustee is provided by 28 U.S.C. § 586(e) which together with 11 U.S.C. §§ 1222(a), 1225(a)(5)(B)(ii), 1226(a) and 1226(c) provide the matrix for the statutory puzzle involving the issue *sub judice*.[2]

The above statutory excerpts clearly indicate the Congressional intent that the trustee will play an integral role in the distribution scheme of a Chapter 12 plan. However, the same statutory conundrum also indicates some possible role to be played out by the farmer.

This Court recognizes a split among several circuits and the various interpretations of the statute which interpret the same language as either allowing or forbidding direct payments by the debtor on claims that have been modified or impaired by the debtor's plan. Accordingly, the Court turns to a review of those decisions.

Not surprisingly, the Trustee and UST assert the position that *In re Fulkrod*, 973 F.2d 801 (9th Cir.1992), properly interprets the applicable sections as prohibiting direct payments by debtors on claims that were modified by the debtor's Chapter 12 plan. Under *Fulkrod*, all payments on impaired or modified claims must be paid through the Chapter 12 trustee and be subject to the fee percentage provisions of 28 U.S.C. § 586(e)(1)(B). In affirming the bankruptcy

court and the Ninth Circuit BAP [3], the Court of Appeals for the Ninth Circuit construed the language of sections 1225(a)(5)(B)(ii) and 1226(c) as "merely recogniz[ing] that the debtor may, as a disbursing agent, sign checks and make cash payments." *Id.* at 803 (citing *In re Finkbine*, 94 B.R. 461 at 465 (Bankr.S.D.Ohio 1988)). However, the court in *Finkbine* recognized that the debtor may petition the court to allow direct payments when an agreement has been reached with a particular creditor.

Without addressing at this point whether such a method of permitting direct payments to creditors is applicable in this Court, it is noteworthy that *Finkbine* does contemplate some acceptable method of direct payments to impaired creditors. The Ninth Circuit, on the other hand, found that there were no provisions under Chapter 12 which could be read to allow such payments under any circumstances and cited to *Finkbine* in support of this. Accordingly, this Court believes that the Ninth Circuit misapplied *Finkbine* and, in doing so, ignored the plain language and congressional intent of 11 U.S.C. §§ 1225(a)(5)(B)(ii) and 1226(c): "the trustee or the debtor" may make distributions "under the plan." To find that *Fulkrod* correctly interpreted these sections as barring all direct payments by the debtor would place this Court in the position of ignoring clear congressional intent. While the Trustee and the UST may prefer the Ninth Circuit's diagnosis of this section, this Court believes that such revisionism lies with the legislative, not the judicial branch.[4] In support of this plain

2. *28 U.S.C. § 586(e)(1) and (2)* "The Attorney General ... shall fix ... a maximum annual compensation ... and ... a percentage fee ... Such individual [referring to standing trustee] shall collect such percentage fee from all payments received by such individual under plans ..."

*11 U.S.C. § 1222(a)(1)* "The plan shall provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan."
*11 U.S.C. § 1225(a)(5)(B)(ii)* "... the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan ..."
*11 U.S.C. § 1226(a)* "Payments and funds received by the trustee shall be retained ... If a

plan is confirmed, the trustee shall distribute any such payment in accordance with the plan ..."
*11 U.S.C. § 1226(c)* "Except as otherwise provided in the plan or in the order confirming the plan, the trustee shall make payments to creditors under the plan."

3. The Ninth Circuit in reality reversed the BAP by holding "Although the BAP hinted that Chapter 12 might permit a debtor to make direct payments to impaired creditors without trustee compensation in certain limited circumstances, that statement is neither necessary to its decisions nor supported by statute."

4. Ironically, this Court believes that the better reasoned *Fulkrod* decision emanated from the Ninth Circuit BAP. 126 B.R. 584. The BAP held that Congress intended that the Chapter 12 Trustee play a vital role in the administration of

language interpretation, the Court looks to *In re Wagner*, 36 F.3d 723 (8th Cir.1994) and *In re Beard*, 45 F.3d 113 (6th Cir.1995).[5]

*Wagner* presented a case where four Chapter 12 debtors proposed plans which called for the direct payment by the debtors to secured creditors whose claims were impaired under the plans. Each of the plans was confirmed and the debtors began making the direct payments as called for with the trustee collecting no percentage fee for these transactions. Subsequent to confirmation, the trustee moved to dismiss the cases because the trustee's fees were not being paid. The bankruptcy court granted the trustee's motions, ruling that debtors could not make direct payments on impaired claims. The district court reversed and the Eighth Circuit affirmed. In short, the Eighth Circuit found that when 11 U.S.C. §§ 1225(a)(5)(B)(ii) and 1226(c) were "read in conjunction, it becomes clear that the code does not forbid plan provisions allowing direct payments by the debtor to impaired secured creditors." *Wagner, supra* at 726. In disregarding *Fulkrod*, the court noted that the Ninth Circuit had rested its decision on policy grounds in favor of the fee provisions found in 28 U.S.C. § 586(e) rather than the text of section 1225. *Id.*

As *Wagner* involved plans which had already been confirmed with no objections by the trustee or any other party, and payments had been commenced, the UST urges the Court to restrict it to its facts. (UST's brief, p. 11). While the Eighth Circuit's decision may reflect the court's reluctance to disrupt the streams of payments going to creditors in light of the trustee's failure to object in a timely manner to the plans proposed, such a

narrow reading of *Wagner* is not warranted. The court made clear "that the debtors' plans permit them to make direct payments to their impaired creditors, and that these provisions of the plans are not in conflict with the bankruptcy code." *Id.*, at 727. There is no indication that this decision was reached by taking into account the lack of objections by the trustee. Thus, even if *Wagner* were restricted to its facts, the circuit's interpretation of 11 U.S.C. §§ 1225(a)(5)(B)(ii) and 1226(c) does not turn on the timely submission of objections to the debtors' proposed plans.

In *Beard* the bankruptcy court confirmed a plan allowing direct payments on the undersecured portion of the claim of Farmers Home Association.[6] The district court affirmed. The Sixth Circuit agreed citing to the plain language of section 1225(a)(5)(B)(ii) as providing that a Chapter 12 debtor may bypass the trustee and directly pay the secured portion of undersecured claims. This Court agrees that the plain language of the statute leaves open the possibility of a direct disbursement by the debtor. Unfortunately, the Sixth Circuit went on to state that "if our holding results in a reduction of trustee's fees it also results in a reduction of their workload." *Beard, supra,* at 120.

This myopic view of reducing the professional life of a standing trustee to scrivener status is troubling, and more importantly, fatally flawed. Issuing a disbursement check is, in most trustee offices, an automated function. If an occasional debtor signs an occasional check, the trustee's workload is virtually unchanged. As the Ninth Circuit BAP observed in their *Fulkrod* opinion, "we emphasize that the trustee is not compensated

those cases and that debtors, who reap the benefits of Chapter 12, pay a substantial portion of trustee administration. The BAP went on, however, to leave open the judicial door to the possibility of debtor disbursement and committed to the "sound discretion of the bankruptcy court" if and when to confirm such a plan.

**5.** The Sixth Circuit in the Beard decision cited to the Tenth Circuit decision in *In re Schollett*, 980 F.2d 639 (10 Cir.1992), as holding that impaired claims must be paid through the trustee. This court reads that decision as standing for the proposition that the Judicial Branch no longer has any authority to review the amount of the

trustee percentage fee and as such is not precedent for the question of what claims may be paid directly by the debtor thus eliminating a trustee fee altogether.

**6.** Pursuant to 11 U.S.C. § 506(a), an allowed claim of a creditor secured by a lien on property in which the estate has an interest, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

for writing checks, but for fulfilling each duty assigned by Congress." *Fulkrod, supra,* at 588.

The trustee is the nucleus of a reorganization; his or her responsibilities begin the day the case is filed and continue until the day the case is closed. The trustee is a fiduciary to all parties in interest, an advisor to the court and a source of information, education and mediation leading hopefully to confirmation. Specific statutory duties of the trustee are found in 11 U.S.C. § 1202 cross-referencing 11 U.S.C. §§ 704 and 1106. However, in the real world of debtors, creditors and the attendant emotions and fragile psyches, the trustee is often the difference between success and failure. His or her voice is one of reason endeavoring to find a common ground among the various adversaries.

With these responsibilities in mind, this Court agrees with the policy underlying the *Fulkrod* decision, namely the support and preservation of the Chapter 12 Trustee system. This Court's recent past experience as the standing Chapter 12/13 trustee for this district gives it a unique appreciation of the vital role the trustee plays in administering estates for the benefit of all concerned. This perspective does not, however, override the fact that the language of section 1225(a)(5)(B)(ii) clearly contemplates that property is to be distributed by *the trustee or the debtor* and that section 1226(c) carves an exception to the general rule that the trustee make the creditor payments.

The crucial question then becomes when will the exception be allowed: when may a debtor disburse directly to an impaired secured creditor? The Court does not find that debtors may simply insert some "magical language" into their plans and expect acquiescence by the court. First and foremost, the debtor has an obligation to propose a plan in good faith. 11 U.S.C. § 1225(a)(3). Second, the Court has wide latitude to enforce the provisions of the Code pursuant to 11 U.S.C. § 105, including the ability to require payments to be made through the trustee to prevent abuse. *Matter of Cross,* 182 B.R. 42 (Bankr.D.Neb.1995). Third, the various provisions of the Bankruptcy Code do not exist in a vacuum and thus a holistic approach must be taken when various provisions of the Code interact. In this case, the question is whether sections 1225(a)(5)(B)(ii) and 1226(c) allow the debtor to modify or impair claims under the plan and make direct payments to those creditors so affected.

The plain language of the aforementioned sections clearly provides for "the trustee or the debtor" to make payments under the plan and for those payments to be made "in accordance with the plan." 11 U.S.C. §§ 1225(a)(5)(B)(ii), 1226(a). To find otherwise would be to ignore the gist of the statute. In determining whether to approve such a so-called "direct pay" plan by the debtor, courts have ruled that a number of factors must be taken into account. Several courts have enunciated multi-part tests to be used as templates in determining whether direct payments should be allowed. *See In re Bettger,* 105 B.R. 607 (Bankr.D.Or.1989) (eight-part test including: plan treatment, consent by affected creditors, legal sophistication of the parties and the potential for abuse of the system by the debtor); *Matter of Pianowski,* 92 B.R. 225 (Bankr.W.D.Mich. 1988) (twelve "non-exclusive factors" largely echoing those of *Bettger* ); *In re Overholt,* 125 B.R. 202 (S.D.Ohio 1990) (citing to *In re Pianowski* ); *In re Teigen,* 142 B.R. 397 (Bankr.D.Mont.1992) (allowing annual lump sum payments to sophisticated creditors and citing factors in *Pianowski* ); *In re Slaughter,* 188 B.R. 29 (Bankr.D.N.D.1995) (three-factor analysis: the creditor's incentive to ensure debtor's continued compliance, the ability of the creditor to protect its interests in the event of a default and the impact a direct payment has on feasibility).

This Court, however, is not inclined to impose a multi-factor test to serve as a scorecard to evaluate direct payments of impaired or modified claims by a debtor. Each Chapter 12 has a similar aura when viewed from a distance. However, upon close scrutiny, subtle differences become apparent, differences that do not lend themselves to a rigid catalogue of criteria. Objective standards applied subjectively give relatively little direction to parties attempting to conform to those guidelines. Thus, while factors such as

the frequency of the occurrence of the payments, the debtor's pre-petition financial history, the good faith of the debtor and the feasibility of the plan may constitute considerations, this Court prefers to evaluate each plan on a case by case basis. The presence or absence of some of the aforementioned factors may certainly figure in the Court's calculus but is not determinative. Therefore, while the plain language of section 1225(a)(5)(B)(ii) provides the means for direct payments by the debtor on claims which are impaired or modified by the plan, the Court continues to exercise its broad powers and discretion under section 105 in confirming or denying such plans. The Court thus declines to accept the autocratic argument of either side. Equity will not thrive under an atmosphere of absolutes.

Finally, both the Trustee and the UST argue that direct payments by Chapter 12 debtors of impaired or modified claims should not be allowed because payments around the trustee diminish his overall compensation and force debtors making payments through the trustee to subsidize debtors whose cases convert or who make direct payments. While there is a certain logical appeal to this concern, 28 USC § 586(e) does not contemplate an economies of scale analysis for trustee fees. While mandating that all payments under the plan be made through the trustee would certainly increase his commissions under the statute and effectively spread the cost of administration across more Chapter 12 cases, the plain language of section 586(e)(2) clearly requires the trustee to collect the statutory "percentage fee from all payments *received by such individual*." (emphasis added). This language represents a change from the prior version of this section which read "such individual [the trustee] shall collect such percentage fee from all payments under plans in cases under chapter 13 of title 11 for which such individual serves as standing trustee." The change obviously restricts what funds the trustee may collect fees on: those *received*. Thus, the Court finds the argument that the trustee system will be better off if all payments under the plan must go through the trustee unpersuasive based on the plain language of the statute.

■ In summary, the Court finds that 11 U.S.C. §§ 1225(a)(5)(B)(ii) and 1226(c) allow direct payments by a Chapter 12 debtor of impaired or modified claims and 11 U.S.C. § 1226(a) mandates that the trustee carry out such payment provisions if a plan is so proposed and is confirmed. However, this Court will review plans which propose direct payments of such claims on a case by case basis to determine whether they should be confirmed. It should be noted parenthetically that it is unlikely that such payments will be approved with any frequency given that Chapter 12 debtors are in need of reorganization in the first place. That fact alone weighs heavily in the Court's mind and should give most debtors pause when considering such payment methods. Congress's clear intention that a Chapter 12 trustee play a significant role in a case under Chapter 12 should also suggest that, although statutorily allowed, direct payments of impaired or modified claims will be the exception, not the rule, for Chapter 12 cases before this Court.

■ Applying the above reasoning to the instant cases, the Court does not find sufficient cause to deviate from the general rule that the trustee should disburse on the impaired claims. Debtor McCann is in poor health and not involved in day to day farm operations. The debtor's son is in charge but has no ownership interest and little managerial experience. Operationally, this is a risky Chapter 12 that requires the direct supervision and monitoring factors of the Trustee. The debtor proposed, subject to this decision, all payments to be made via the trustee and this Court does not see a need to upset that proposal.

■ The Keller matter presents a more stable Chapter 12 environment, however, the debtor has failed to convince this Court that the Trustee should be bypassed, with the exception of the auto loan. If the vehicle is sold, the proceeds may be transmitted directly to the creditor involved. However, the restructured long term debt with Empire Farm Credit and Central National Bank must be paid by the Trustee for the time period the Kellers are under the jurisdiction of this Court. The debtors were in default

prepetition and as this is a five year plan, all parties in interest, including the Court, will be better served by the Trustee monitoring the debtors' compliance with the terms of any confirmation order. The Trustee's second objection which concerns the treatment of Agway has been rendered moot by the debtors' amended plan and, as such, is not addressed by this Court.

Accordingly, the Chapter 12 Trustee is hereby directed to prepare and file confirmation orders consistent with this opinion.